IN THE MATTER OF: CALVIN WAYNE JACKSON, JR., JUVENILE

No. 8627DC647

(Filed 3 February 1987)

**1. Infants § 20; Schools § 4— juvenile court—authority to direct order to school board**

    Fundamental fairness did not prohibit the trial court in a juvenile delinquency proceeding from entering an order directed to a county school board

merely because the school board was not formally made a party to the proceeding.

**2. Infants § 20; Schools § 10— suspended student—alternative educational program—no authority in juvenile court to order**

When a student has been lawfully suspended or expelled from the public school system pursuant to N.C.G.S. 115C-391 and the school system has not provided a suitable alternative educational forum, the juvenile court has no authority to order a county school board to place the student in an appropriate school program absent a voluntary reconsideration or restructuring of the suspension by the school board to allow the student's restoration to an educational program within its system.

**3. Schools § 10— suspended student—alternative educational program—no duty by school system**

The public school system has no obligation to provide an alternative educational program for students suspended for misconduct.

ON writ of certiorari to review order entered by *Langson, Judge.* Order entered 23 January 1986 in District Court, GASTON County. Heard in the Court of Appeals 19 November 1986.

*Garland & Alala, P.A., by James B. Garland, Julia M. Shovelin, and Elizabeth G. Sarn, for petitioner appellant Gaston County Board of Education.*

*Joseph B. Roberts, III, P.A., by Stephen T. Gheen, for respondent appellee.*

*Smith, Patterson, Follin, Curtis, James & Harkavy, by Martha E. Johnston for Governor's Advocacy Council for Persons with Disabilities, amicus curiae.*

*Daniel D. Addison for Governor's Advocacy Council for Children and Youth, amicus curiae.*

BECTON, Judge.

This appeal concerns the validity of an order of Gaston County District Court Judge Larry L. Langson directing the petitioner, Gaston County Board of Education, to place the respondent, Calvin Wayne Jackson, Jr., in an appropriate school program after Calvin Jackson had been suspended from the Gaston County public schools. The issues presented involve the extent of the district court's authority in making dispositions pursuant to the North Carolina Juvenile Code, Articles 41-59 of

Chapter 7A of the General Statutes, and the responsibility of the public schools toward students who have been lawfully suspended or expelled. For the reasons discussed hereafter, we conclude that the challenged order was improperly entered, and therefore we reverse.

I

Calvin Wayne Jackson, Jr. was suspended from the Gaston County school system on 7 October 1985 for the remainder of the 1985-86 school year, as a result of having physically assaulted a student and a teacher and verbally and profanely threatening another teacher. The suspension was upheld on appeal by a hearing board of the Gaston County Board of Education.

Beginning 9 October 1985, three juvenile petitions were filed against Calvin charging him with simple assault, breaking and entering with intent to commit larceny, larceny of a firearm, and carrying a concealed weapon. Proceedings were instituted and heard pursuant to provisions of the North Carolina Juvenile Code. Jackson was apparently adjudicated a delinquent by juvenile court Judge Langson. In an order continuing the dispositional hearing to 23 January 1986, Judge Langson indicated his intent that Calvin "be placed in some type of public school situation," and ordered the Gaston County Board of Education to appear at the proceeding "to present a plan that would be of benefit both to the school and the Respondent."

Representatives of the Board, including legal counsel and school personnel, appeared at the hearing where Judge Langson questioned them regarding Calvin's suspension and attempted to involve the school system in developing an educational program for Calvin. The Board contended that the school system did not have a suitable program for Calvin or funds to implement one. Following the hearing, during which the Board declined to propose a plan, the court ordered the Gaston County School System to immediately "place the Respondent, Calvin Jackson, Jr., in whatever type of school program the School System deems appropriate."

Among the court's numerous findings of fact is the finding that Calvin had been legally suspended due to his fighting and aggressive behavior, and the further finding that in suspending

Calvin, the School Board had complied with the procedures set forth in N.C. Gen. Stat. Sec. 115C-391(c) (1983). The court concluded as a matter of law:

(1) THAT pursuant to General Statute [Sec.] 7A-516(3), 7A-646, and 7A-649(a)(b) [sic] the Court has the authority to decide if it is in the Respondent's best interest to attend a Public School Facility in his County.

(2) THE COURT CONCLUDES AS A MATTER OF LAW that it is in the particular Respondent's best interest that he attend some type of School Program, so he is not left to his own devices until the school year commencing in August, 1986 starts.

(3) THE COURT FURTHER CONCLUDES AS A MATTER OF LAW that regardless of whether or not G.S. 115(c) -391(c) has been complied with, the Public School System has an obligation to school age children to provide some type of forum to the Juveniles, so that they are not left free to roam at will.

(4) THE COURT FURTHER CONCLUDES AS A MATTER OF LAW that the particular forum to be provided to the Respondent shall be left totally up to the Gaston County School System, it merely being the intention of the Court that the Juvenile be allowed to attend some Facility where he can partake of some program and in some way learn how to be a more productive citizen.

The Board of Education appealed the order and sought a temporary stay which was granted by this Court 20 March 1986. On 3 April 1986 this Court allowed the Board's petitions for writ of supersedeas and writ of certiorari. Thereafter, this Court granted motions of the Governor's Advocacy Council for Persons with Disabilities and the Governor's Advocacy Council on Children and Youth to file *amicus curiae* briefs in support of the respondent.

II

At the outset we note that this case is technically moot inasmuch as Calvin Jackson's suspension from the Gaston County schools terminated at the end of the 1985-86 school year. However, the case is similar to that category of cases which federal courts, in determining the existence of federal jurisdiction

in otherwise moot cases, term "capable of repetition yet evading review." *See, e.g., Moore v. Ogilvie*, 394 U.S. 814, 23 L.Ed. 2d 1 (1969). Children involved in delinquency proceedings are frequently guilty of misconduct at school and thus subject to school board disciplinary proceedings as well. Until the conflict between a school system's right to suspend students for misconduct and the juvenile court's authority to fashion sensitive and appropriate dispositions which include provision for the educational needs of adjudicated delinquent juveniles is resolved, it is not improbable that the Gaston County Board of Education or other local school boards will be repeatedly subject to orders like the one in the case *sub judice*. Because a suspension pursuant to G.S. Sec. 115C-192(c) can never be longer than the balance of the school year, the effect of an order overriding the suspension may always be of too short a duration to allow full litigation of the issues prior to its expiration. Consequently, we exercise our discretion to decide the issues presented.

### III

[1] As a further preliminary matter, we reject the Board's contention that because the Board was not a party to the juvenile proceeding, the Court lacked jurisdiction to enter its order. Specifically, the Board argues that an order addressing a person not a party to the action violates principles of fundamental fairness and due process.

Many of the dispositive alternatives available to the juvenile court under the Juvenile Code must be implemented through third parties — generally agencies of the state or county. *See* N.C. Gen. Stat. Secs. 7A-647, -648, and -649. In *In re Brownlee*, 301 N.C. 532, 272 S.E. 2d 861 (1981), our Supreme Court recognized that many of these alternatives are not self-executing, and, without the grant of authority in G.S. Sec. 7A-647 to charge costs of certain care to the county, would be "empty and unworkable." *Id.* at 553-54, 272 S.E. 2d at 874. Likewise, many of these provisions would be unworkable if the Court lacked authority to order local public agencies to assist in implementing its dispositions in otherwise appropriate cases.

The School Board, in this case, had adequate notice of the action and its potential implications for the Board and was given an opportunity to be heard at the dispositional hearing. Under these

circumstances, we conclude that fundamental fairness did not prohibit the Court from entering an order directed at the Board merely because the Board was not formally made a party to the proceeding.

## IV

The School Board further contends that the Court's order violates the Separation of Powers clause of the North Carolina Constitution. We summarily reject this argument without discussion.

## V

The determinative issues in this case, arising from the court's first and third conclusions of law, are: (1) whether the Juvenile Code authorizes district courts to require public school attendance by an expelled or suspended juvenile, and (2) whether the public school system is legally obligated to provide an alternative forum for such students.

## A

**[2]** 1. The District Court concluded that N.C. Gen. Stat. Secs. 7A-516(3), -646, and -649(8)(b) (1981) granted it the authority to require Calvin Jackson to attend a public school facility in his county. The Board maintains that (1) the Court erred in its construction of these provisions of the Juvenile Code and their relationship to N.C. Gen. Stat. Sec. 115C-391 which authorizes the suspension from school of students who willfully violate school conduct policies, and (2) the Court thus exceeded its authority under the Juvenile Code in ordering the Board to place Calvin Jackson in a public school program when Calvin had been legally suspended and no appropriate alternative educational program existed for suspended students.

G.S. Sec. 7A-516 and -646 are general statements of the purposes and policies behind the Juvenile Code which indicate that the Court, in making dispositions, should consider the needs of the child, the family, and the public and should utilize appropriate community resources whenever possible. G.S. Sec. 7A-649, which sets forth dispositional alternatives available "in the case of any juvenile who is delinquent," allows a judge to place the juvenile on probation and require as a condition of probation "[t]hat the juvenile attend school regularly." G.S. Sec. 7A-649(8)(b).

Proper construction of statutes requires that individual portions be examined within the context of the whole law and "accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit." *Watson Industries v. Shaw, Comm'r of Revenue*, 235 N.C. 203, 210, 69 S.E. 2d 505, 511 (1952). Having reviewed the above provisions in the context of the entire Juvenile Code, we conclude that the Court exceeded its statutory authority in entering the challenged order.

First, despite the expansive discretion and flexibility granted to district courts for fashioning suitable dispositions for delinquent juveniles, the Code limits treatment through community based services to what is consistent with the protection of public safety. G.S. Sec. 7A-516(1) and (3). The court must weigh not only the needs of the child but also the best interests of the state. *In re Brownlee* at 553, 272 S.E. 2d at 874. Calvin Jackson was before the juvenile court on serious charges including carrying a concealed weapon. He had a history of aggressive behavior at school which led his principal to conclude that Calvin posed "a serious threat to . . . students and staff." The judge himself acknowledged that Calvin should not be returned to the regular classroom. There is no evidence or any finding of fact to support the court's determination that Calvin could be safely returned to any public school program.

Second, although the court carefully, and quite properly, avoided dictating any specific program for Calvin, leaving the choice of forum to the School Board, the record indicates that no suitable program existed. Thus, the order's practical effect was to require creation of a new program and a resultant reallocation of school resources. In *In re Wharton*, 305 N.C. 565, 290 S.E. 2d 688 (1982) our Supreme Court held that a juvenile court exceeded its authority under the Juvenile Code by ordering a county Department of Social Services to "implement the creation of a foster home" for a juvenile and others like him. We interpret the relevant Juvenile Code provisions and the *Wharton* opinion to limit the district court's authority in juvenile dispositions to utilization of currently existing programs or those for which the funding and machinery for implementation is in place.

Finally, and most significantly, a special limitation upon the court's authority exists when, as in the present case, the juvenile

involved has been lawfully suspended from the public school system. Local boards of education are required by G.S. Sec. 115C-391(a) (1983) to adopt policies governing student conduct and procedures for suspension or expulsion of students. G.S. Sec. 115C-391(c) expressly authorizes a school principal, with the prior approval of the superintendent, to suspend, for a period not to exceed the time remaining in the school year, a student who willfully violates conduct policies. These statutes are a part of the comprehensive scheme set forth in Chapter 115C of the General Statutes for the operation of our public elementary and secondary schools.

The Legislature, in granting to judges the authority to require school attendance under the Juvenile Code, did not consider the potential conflict with G.S. Sec. 115C-391 or the effect of a lawful suspension upon that authority. However, statutes which deal with the same subject matter must be construed in *pari materia* and be harmonized, if possible, to give effect to each. *In re Brownlee* at 549, 272 S.E. 2d at 871. Irreconcilable ambiguities should be resolved so as to effectuate the legislative intent. *State ex rel. Comm'r of Insurance v. North Carolina Rate Bureau*, 300 N.C. 381, 400, 269 S.E. 2d 547, 561, *reh. denied*, 301 N.C. 107, 273 S.E. 2d 300 (1980). We find no indication in G.S. Sec. 115C-391 of legislative intent to limit in any way a school board's right to suspend from its educational system a student who has come within the jurisdiction of the juvenile court. Nor do we find within the Juvenile Code any legislatively granted authority to interfere with a school's disciplinary procedures. The court's authority to require regular school attendance does not necessarily mean *public* school attendance. Yet, the effect of the challenged order in this case is to overrule the Board's decision to suspend Calvin Jackson.

The public school system is unquestionably one of the most important community based resources available for addressing the problems of juveniles. Furthermore, the Juvenile Code evidences a legislative intent that, in juvenile dispositions, district courts shall, whenever possible, utilize community based services and accommodate the educational needs of delinquent juveniles. We agree with Respondent's assertion that the courts may ordinarily, under appropriate circumstances, order a delinquent juvenile placed within a local public school system. Nevertheless,

we hold that when a student has been lawfully suspended or expelled pursuant to G.S. Sec. 115C-391 and the school has not provided a suitable alternative educational forum, court-ordered public school attendance is not a dispositional alternative available to the juvenile court judge, absent a voluntary reconsideration of or restructuring of the suspension by the school board to allow the student's restoration to an educational program within its system.

2. The Respondent improperly relies upon statutes requiring the education of children with certain "special needs" as defined by G.S. Sec. 115C-109 (Cum. Supp. 1985) as support for the proposition that the authority of local boards of education to suspend students may be limited. G.S. Sec. 115C-112 (1983 & Cum. Supp. 1985) prohibits a local education agency from initiating its normal disciplinary procedures when a child with "special needs" exhibits behavior which would otherwise result in suspension for more than 10 days and the misconduct is caused by the special needs.

No one questions the authority of a juvenile court judge to order the public school placement of a child already determined to have special needs who is suspended in violation of this statute. Moreover, a juvenile court judge who has reason to believe that a child has special needs which have been overlooked by school personnel may, upon sufficient findings of fact, order that the child be evaluated and suitably placed if determined to have special needs. However, every child with behavioral or disciplinary problems does not have special needs within the purview of the statute. Nor was it ever suggested in the court below that Calvin Jackson might be a "special needs" child. We need not address the issue further since it was raised only on appeal and is before us primarily upon the *amicus curiae* brief of the Governor's Advocacy Council for Persons with Disabilities.

B

[3] The District Court's evaluation of its authority under the Juvenile Code was plainly influenced by its own determination that the public school system has an obligation to provide an alternative forum for suspended students "so that they are not left free to roam at will." The court apparently derived that obligation from the right to an education established by Article IX, Section 2 of the Constitution of North Carolina. However, as

this Court stated in *Fowler v. Williams*, 39 N.C. App. 715, 718, 251 S.E. 2d 889, 891 (1979), "[t]he right to attend school and claim the benefits of the public school system is subject to lawful rules prescribed for the government thereof." A student's right to an education may be constitutionally denied when outweighed by the school's interest in protecting other students, teachers, and school property, and in preventing the disruption of the educational system. As a general rule, a student may be constitutionally suspended or expelled for misconduct whenever the conduct is of a type the school may legitimately prohibit, and procedural due process is provided. Reasonable regulations punishable by suspension do not deny the right to an education but rather deny the right to engage in the prohibited behavior. *See Craig v. Buncombe Co. Board of Education*, 80 N.C. App. 683, 343 S.E. 2d 222 (1986).

The public schools have no affirmative duty to provide an alternate educational program for suspended students in the absence of a legislative mandate. Rapp, Education Law, Vol. 2, Sec. 9.06(3)(d) (1986). The grant of authority to suspend or expel in N.C. Gen. Stat. Sec. 115C-391 is not expressly limited to suspensions from the regular classroom but contemplates suspension from the entire system. Furthermore, G.S. Sec. 115C-391(d), which allows a child with "special needs" to be expelled under limited circumstances, provides that: "Notwithstanding the provisions of G.S. 115C-112 [prohibiting suspension of children with 'special needs'], a local board of education *has no duty* to continue to provide a child with special needs, expelled pursuant to this subsection, with any special education or related services during the period of expulsion." (Emphasis added.) This language represents a clear legislative recognition that under certain circumstances a child may lose his right to benefit from *any* public school program.

We understand Judge Langson's concern that suspended students should not be left without supervision. In cases like this one, in which school officials have determined that a student's misconduct precludes his placement in any existing public school program, but the juvenile court concludes that the likelihood of future extreme misconduct is not great enough to justify commitment to a training school, there is an overwhelming lack of rea-

In re Jackson

sonable alternatives for effective placement. However regrettable the existence of this void, a court may not overcome it by fiat.

The school system is the primary societal institution affecting the lives of school-age youth and can potentially play a key role in delinquency prevention and intervention. Kurtz & Lindsey, *A School-Juvenile Court Liaison Model for the Prevention of Juvenile Delinquency*, Juv. & Fam. Ct. J., Winter 1985-86, at 9. Consequently, in-school citizenship education, which helps to mold and perpetuate societal norms and values, which reduces students' tendencies to resort to violence,[1] and which help students learn how to become effective, responsible, participating citizens in a pluralistic, democratic society, should be the joint goal of our juvenile courts and school systems. Communication and cooperation between courts and school authorities is thus critical for juvenile courts to effectively address the problems of troubled youth. Judge Langson's effort to enlist the cooperation of the Gaston County School in devising a suitable disposition for Calvin Jackson is commendable. Judge Langson was obviously aware that 65% of America's crime, including 30% of the violent crime, is committed by juveniles;[2] that, here in North Carolina, approximately 20% of those arrested for the most serious crimes are under 18;[3] that a student in grade school is statistically more likely to spend time later in a correctional institution than in college;[4] that an appropriate education is not nearly as expensive as the alternative, considering the fact that the average education level for all prisoners in North Carolina is the 6th grade;[5] and that the Calvin Jacksons of this State should not be left free to roam

---

1. The teaching of values in school reduces students' tendencies to resort to violence, enhances their understanding of our legal system, and helps them develop more constructive attitudes toward it. *See* Report: Office of Juvenile Justice and Delinquency Prevention, 1981.

2. Address by Terrel Bell, Secretary, Department of Education, at the National Conference on Law-Related Education, October 21, 1982, Washington, D.C.

3. Report to The Governor's Executive Cabinet on Juveniles by Attorney General Rufus L. Edmisten, February 19, 1982.

4. *See* Calla Smorodin and Linda Riekes, Why Teach About Law? Here's What You'll Need To Make The Case, ABA-LRE Project Exchange, Vol. 1, No. 1, Spring 1981.

5. Report: Citizens Commission on Alternatives to Incarceration, p. 7, Fall, 1982.

at will. Notwithstanding these grim statistics, a juvenile court judge does not have the power to legislate or to force school boards to do what he thinks they should do. Our legislature did not impose upon the public schools or other agency a legal obligation to provide an alternative forum for suspended students, and a court may not judicially create the obligation.

## VI

Pursuant to Rule 10(a) of the Rules of Appellate Procedure, the question presented for our review is whether the order below is supported by the findings of fact and conclusions of law. For the reasons discussed, we have determined that the district court's conclusions of law regarding its authority under the Juvenile Code and the responsibility of the public schools toward suspended students are not supported by the record and relevant legal authority. Consequently, we conclude that the order was erroneously entered and therefore we reverse.

Reversed.

Judges WELLS and ORR concur.